# Exhibit 6

LEXSEE


Analysis
As of: Jun 12, 2015

THOMAS L. TAYLOR, III, Plaintiff, v. COMMUNITY BANKERS SECURITIES, LLC, et al., Defendants.

CIVIL ACTION H-12-02088

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

2013 U.S. Dist. LEXIS 86485

June 20, 2013, Decided
June 20, 2013, Filed

**PRIOR HISTORY:** Taylor v. Cmty. Bankers Sec., LLC, 2012 U.S. Dist. LEXIS 179266 (S.D. Tex., Dec. 19, 2012)

**CORE TERMS:** receiver, fraudulent transfer, investors, unjust enrichment, pled, fraudulent, entity, corporate form, veil-piercing, enrichment, sufficient facts, constructive fraud, choice-of-law, transferred, place of business, causes of action, particularity, defrauded, offering's, corporate veil, quotation marks omitted, significant relationship', good faith, heightened, brokerage, ancillary, managing, centered, piercing, survive

**COUNSEL:** [*1] For Mr. Thomas L. Taylor, III, Solely in his Capacity as Court-Appointed Receiver for Evolution Capital Advisors, LLC, etc, Plaintiff: Andrew M Goforth, Thomas L Taylor, III, The Taylor Law Offices, P.C., Houston, TX.

For Community Bankers Securities, LLC, Waterford Investor Services, Inc., Allied Beacon Partners, Inc., AIC, Inc., Richard E. Landi, Defendants: Walter S Cowger, Law Office of Walter S Cowger, Dallas, TX.

**JUDGES:** Gray H. Miller, United States District Judge.

**OPINION BY:** Gray H. Miller

**OPINION**

**Memorandum Opinion & Order**

Pending before the court is defendants Community Bankers Securities, LLC, Waterford Investor Services, Inc., Allied Beacon Partners, Inc., AIC, Inc., and Richard E. Landi's (collectively, the "defendants") renewed motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. 17. After reviewing the parties' briefing, the complaint, and applicable law, the defendants' renewed motion to dismiss (Dkt. 17) is **DENIED.**

**I. Background**

On August 10, 2011, the Securities and Exchange Commission (the "SEC") commenced an enforcement action styled *Securities & Exchange Commission v. Evolution Capital Advisors, LLC, et al.*, No. 4:11-cv-2945, in the United States District Court for [*2] the Southern District of Texas, Houston Division. *See* Enforcement Action ("EA") Dkt. 1. The SEC alleged securities fraud with respect to two "Secured Note" offerings (the "Notes") by Evolution Capital Advisors, LLC ("ECA"), Evolution Investment Group I, LLC ("EIGI"), and Damian Omar Valdez made between

Page 1

February 2008 and August 2010. EA Dkt. 42 at 1. Valdez is the founder and manager of ECA and EIGI (collectively, "Evolution"), which are organized under Delaware law. EA Dkt. 1 at 5-6 ¶¶ 14-15. Evolution's operations, at all relevant times, were based at its principal office in The Woodlands, Texas. *Id.*; Dkt. 19, Ex. 1 (affidavit of Thomas Taylor) at 3 ¶ 3. Indeed, Evolution's Chief Operations Officer and Managing Director conducted investment strategy and compliance work from The Woodlands, where most of the corporate paper files were stored. Dkt. 19, Ex. 1 at 4 ¶ 6. Evolution's electronic files were maintained on a Dallas server. *Id.* at 3 ¶ 3.

The SEC claimed that Evolution made misleading and incomplete representations to potential investors in the Notes, thereby violating the Securities Act of 1933 and the Securities Exchange Act of 1934. [1] EA Dkt. 42 at 1, 4. Through the sale of [*3] the Notes, Evolution received approximately $10.1 million in investments from 82 investors (the "Noteholders"). *Id.* at 5. The SEC also alleged that Evolution used $2.7 million from the proceeds of the second offering to make premium payments to the first offering's investors, in what the SEC characterized as "Ponzi" payments. [2] *Id.* According to the SEC, the alleged misrepresentations in the Notes, along with the defendants' practice of taking "exorbitant" fees in the amount of $2.4 million, created a "dire" financial situation for Evolution and, in turn, its Noteholders. *Id.* As of December 31, 2010, Evolution's assets were at least $1.4 million less than the amount owed to the Noteholders. *Id.* at 5-6.

> [1] Evolution issued the Notes through private placement memoranda ("PPMs") used by CBS and Waterford in their marketing efforts. The PPMs listed Evolution's corporate address in The Woodlands as the point of contact and place of payment for investors. *See, e.g.*, Dkt. 19, Ex. H at I (cover page); *id.*, Ex. A at 32 ¶ 9 ("[T]he payment of principal on or before the Maturity Date will be made only upon presentation and surrender of this originally executed Note at the office or agency of the [*4] Maker in the City of The Woodlands, State of Texas.").
> [2] As explained by the Fifth Circuit: "In a Ponzi scheme, a swindler promises a large return for investments made with him. The swindler actually pays the promised return on the initial investments in order to attract additional investors. The payments are not financed through the success of the underlying venture but are taken from the corpus of the newly attracted investments. The swindler then takes an appropriate time to abscond with the outstanding investments." *United States v. Cook*, 573 F.2d 281, 282 n.3 (5th Cir. 1978).

The SEC sought equitable relief in the form of preliminary and permanent injunctions against future violations of the securities law by Evolution, an asset freeze, and the appointment of a receiver to take control of, marshal, and preserve Evolution's assets for the benefit of defrauded Noteholders. *See* EA Dkts. 3-6. On December 22, 2011, after an October hearing on the request for injunctive relief, the court granted the request for injunctive relief and appointed a receiver. EA Dkt. 42. The court held that Evolution perpetrated a fraudulent Ponzi scheme through the offer and sale of the Notes to the Noteholders. [*5] *Id.* at 28 ("The SEC has presented compelling evidence that [Evolution's] current financial situation will permit the current investment strategy to succeed only if new investors are found whose money can be used to fund payments to the prior investors. This is the quintessential Ponzi scheme.").

As part of this scheme, Evolution sold the Notes to the Noteholders through FINRA- and SEC-registered brokerage firms and their registered representatives. Dkt. 1 at 2 ¶ 4. Community Bankers Securities, LLC ("CBS"), a registered firm with its principal place of business in Richmond, Virginia, was the primary placement agent for the Evolution offerings. *See* Dkt. 20, Ex. A (Affidavit of Richard E. Landi ("Landi")) at 2 ¶ 7, 3 ¶ 12. CBS subcontracted with other brokers to offer Evolution promissory notes to prospective investors, including defendant Waterford Investor Services, Inc. ("Waterford"), [3] which acted as a sub-dealer under CBS until December 2009. Dkt. 17 at 2 ¶ 5. After December 23, 2009, CBS assigned its rights as managing dealer to Waterford, and Waterford then served as managing dealer of the Evolution Notes. Dkt. 20, Ex. A at 5 ¶ 24. [4]

> [3] In January 2011, defendant AIC, Inc. ("AIC"), [*6] a Virginia corporation with its principal place of business in Richmond, Virginia, sold Waterford to Beacon Acquisition Partners, Inc. ("BAP"). Dkt. 1 at 5 ¶ 14. BAP then changed Waterford's name to Allied Beacon Partners, Inc. ("ABP"). *Id.* ABP is also a named defendant in

this action and is Florida corporation with its principal place of business in Richmond, Virginia. *Id.* The receiver alleges that AIC operated CBS and Waterford/ABP as alter egos and "asks this Court to disregard the corporate form as to AIC, CBS, Waterford and Waterford's successor in interest ABP." Dkt. 19 at 2.

4  The relevant broker and sales agreements among Evolution, CBS, Waterford/ABP, the sub-dealers, and registered representatives contain Virginia choice-of-law provisions for contractual disputes. Dkt. 20, Ex. A at 6 ¶¶ 27-29.

The financial arrangement between Evolution and its broker was relatively simple. When a Note was sold, Evolution wired commissions and fees to a CBS account at Wachovia Bank in Richmond, Virginia, and, beginning on March 12, 2010, to a Waterford account at Wachovia Bank in Richmond, Virginia. Dkt. 17 at 3-4 ¶ 11. According to the defendants, of the $170,900 in commissions and fees Waterford [*7] received, Waterford paid $122,925 to sub-dealers and approximately $30,000 to its registered representatives for services rendered. *Id.* at 3 ¶ 6. In total, defendants CBS and Waterford received over $750,000.00 in commissions and fees related to the two offerings. Dkt. 1 at 3 ¶ 6.

Thomas L. Taylor, III, the court-appointed receiver and the plaintiff in this case (the "plaintiff" or "receiver") demanded disgorgement of these fees, claiming that they were fraudulent proceeds of a Ponzi scheme. *Id.* at 2-3 ¶¶ 4-6. When the defendants did not comply, the receiver filed the instant action. *Id.* at 3 ¶¶ 6-7. Defendants move to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, contending that the receiver fails to state plausible claims for relief against them under Virginia law. Dkt. 17 at 5-13. The receiver responds that the court should apply Texas law to the substantive claims, and he has pled sufficient facts to withstand a motion to dismiss. Dkt. 19 at 9-23. The motion is ripe for disposition.

**II. Legal Standard**

For most causes of action, Rule 8(a)(2) requires that the pleading contain "a short and plain statement of the claim showing that the pleader [*8] is entitled to relief." Fed. R. Civ. P. 8(a)(2). A party against whom claims are asserted may move to dismiss those claims when the nonmovant has failed "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "'enough facts to state a claim to relief that is plausible on its face.'" In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations omitted). While the allegations need not be overly detailed, a plaintiff's pleadings must still provide the grounds of his entitlement to relief, which "requires more than labels and conclusions," and "a formulaic recitation of the elements of a cause of action will not do." *Id.*; see also Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ("[N]aked assertions devoid of further factual enhancement," along with "legal conclusions" [*9] and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the presumption of truth) (internal quotation marks omitted). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (internal quotation marks omitted). Evaluating a motion to dismiss is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

And if a party's claim contains allegations of fraud, the pleading must meet a heightened standard and "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 185 (5th Cir. 2009) (noting that Rule 9(b) does not "supplant" Rule 8(a)). However, this particularity requirement "does not 'reflect a subscription [*10] to fact pleading.'" Kanneganti, 565 F.3d at 186 (quoting Williams v. WMX Techs., Inc., 112 F.3d 175, 178 (5th Cir. 1997)). Instead, pleadings alleging fraud must contain "simple, concise, and direct allegations of the circumstances constituting fraud, which . . . must make relief plausible, not merely conceivable, when taken as true." *Id.* (internal quotation marks omitted) (referring to the standard enunciated in *Twombly*

).

## III. Analysis

### A. Choice of Law

Before the court may evaluate whether the receiver has pled plausible claims for relief to pass muster under Rule 12(b)(6), the court must first determine the governing law for each claim. The receiver claims that Texas law governs the fraudulent transfer and unjust enrichment claims, as the alleged fraudulent conduct occurred in Evolution's Texas office. Dkt. 19 at 10-17. By contrast, defendants contend that the court should apply the law of the Commonwealth of Virginia because defendants received the challenged commissions and fees, and performed their services, in Richmond, Virginia. Dkt. 17 at 5-7. After discussing the standards that guide the court's choice-of-law analysis, the court evaluates each substantive claim in turn. [5]

> 5   The [*11] parties agree that the organizational state law for each entity whose corporate form is sought to be disregarded governs the veil-piercing contentions. Faulkner v. Kornman (In re The Heritage Org., LLC), 413 B.R. 438, 510 (Bankr. N.D. Tex. 2011) (applying Texas law). The court thus focuses its attention on the disputed choice-of-law issues for the receiver's substantive claims.

The court has original jurisdiction over the receiver's state-law claims that are ancillary to the receivership established under federal securities laws. Riehle v. Margolies, 279 U.S. 218, 223, 49 S. Ct. 310, 73 L. Ed. 669 (1929) ("The appointment of a receiver of a debtor's property by a federal court confers upon it, regardless of citizenship and of the amount in controversy, federal jurisdiction to decide all questions incident to the preservation, collection, and distribution of the assets. It may do this either in the original suit . . . or by ancillary proceedings . . . .") (citations omitted); Robb Evans & Assocs., LLC v. Holibaugh, 609 F.3d 359, 363 (4th Cir. 2010) (explaining that a receiver's separate proceeding to marshal assets related to the receivership falls within the common-law doctrine of ancillary jurisdiction, [*12] even after Congress's 1990 codification of supplemental jurisdiction under 28 U.S.C. § 1367). When a Texas federal court exercises ancillary or supplemental jurisdiction over state-law claims, the court applies the choice-of-law rules of Texas, the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941); see also In re Enron Corp. Secs., Derivative, & "ERISA" Litig., 511 F. Supp. 2d 742, 790 (S.D. Tex. 2005).

Texas courts look to the Restatement (Second) of Conflicts of Laws (the "Restatement") when considering choice-of-law questions. See Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 420-21 (Tex. 1984). Fraudulent transfer claims sound in tort. See In re Tex. Am. Express, Inc., 190 S.W.3d 720, 725 (Tex. App.--Dallas 2005, no pet.). For most tort claims, Texas courts apply "the 'most significant relationship' test as enunciated in Sections 6 and 145 of the Restatement." Gutierrez v. Collins, 583 S.W.2d 312, 318 (1979). Unjust enrichment is an equitable principle and choice of law for this claim is also subject to the most significant relationship test, as set forth in Section 221 of the Restatement. [6] This court will thus apply the appropriate Restatement [*13] sections below to determine whether Texas or Virginia law applies to the receiver's claims.

> 6   The court recognizes the legal debate over whether "unjust enrichment" is a cause of action or merely a remedy under Texas law. See Hancock v. Chi. Title Ins. Co., 635 F. Supp. 2d 539, 560-61 (N.D. Tex. 2009) (discussing the status of unjust enrichment). However, the debate is academic for purposes of this order because neither party has raised the issue. The court therefore assumes, without deciding, that "unjust enrichment" is a claim under Texas law.

### 1. The Fraudulent Transfer Claims

Section 6 of the Restatement's general principles are as follows:

> [T]he factors relevant to the choice of the applicable rule of law include
>
>    (a) the needs of the interstate and international systems,
>
>    (b) the relevant policies of the forum,
>
>    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflicts of Laws § 6(2) [*14] (1971).

For tort actions, section 145 prescribes the following analysis:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Id.* § 145. This "analysis should not turn on the number of contacts, but more importantly on the qualitative nature of those contacts as affected by the policy factors enumerated in Section 6." *Gutierrez, 583 S.W.2d at 319*. Further, courts should generally evaluate the contacts applicable to a section 145 analysis first, as those contacts provide [*15] context for a review of the underlying principles of § 6 of the Restatement. *See MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.), 675 F.3d 530, 537 (5th Cir. 2012)*.

Under § 145 of the Restatement, the first two factors are the places where the injurious conduct occurred and resulting injury occurred. RESTATEMENT § 145(2)(a)-(b). For fraudulent transfer claims in which the injury is intangible, however, it is "very difficult to assign a meaningful location to the injury." *Commerzbank, 675 F.3d at 537*. In these circumstances, the Fifth Circuit has approved of the Restatement's commentary that "suggests that . . . the importance of this factor is severely diminished." *Id.* (citing Restatement § 145 cmt. e (1971)). With regard to the conduct at issue, the alleged fraud was centered at Evolution's office in The Woodlands, Texas. The PPMs that the Noteholders received listed Evolution's Texas office as the place of payment related to the investments, and the PPMs were distributed to investors at the direction of Evolution's Managing Director, who was also located in Texas. Accordingly, these contacts related to the alleged fraudulent conduct weigh heavily in favor of the application [*16] of Texas law.

Moreover, the third and fourth factors under the § 145 analysis provide little guidance in the instant case. While the defendants are largely based in Virginia, the receiver, who represents the interests of the investors and the company, is based in Texas. Further, because the transfers occurred between Texas and Virginia, with most business conducted by telephone in both states, there is no distinct location in which the parties' relationship was centered. Nevertheless, after considering the four factors under § 145 of the Restatement, the court finds that Texas has the most significant relationship to the fraudulent transfers at issue. The court now turns to the general principles of § 6 to determine whether the law of Texas should apply to these claims.

Under § 6 of the Restatement, the second, third, and

fifth factors address the interrelationship of the policies of the forum and other interested states, as well as the policies underlying the particular field of law. Restatement § 6(b), (c), & (e). In *Commerzbank*, the Fifth Circuit held that the district court should apply the law of New York instead of Georgia because the prospect of a recovery for defrauded investors [*17] was greater under New York's fraudulent transfer law. *Commerzbank*, 675 F.3d at 537-38. Because the facts of *Commerzbank* involved the enforceability of a loan guaranty, the court preferred New York law that placed such guarantees within the ambit of fraudulent transfer law. *Id.* By contrast, a Georgia statute did not treat guarantees as transfers. *Id.* The court concluded that "the basic creditor protection policy underlying fraudulent transfer law will be better served by the application of New York law." *Id.*

Here, consistent with *Commerzbank*, the underlying policy for the enactment of laws against fraudulent transfers is the protection of creditors. *Id.* at 537. Texas has enacted the Uniform Fraudulent Transfer Act (UFTA) in what is generally referred to as the Texas Uniform Fraudulent Transfer Act (TUFTA). *See* Tex. Bus. & Com. Code Ann. § 24.001 *et seq.* TUFTA provides two grounds for recovery of fraudulently transferred assets: actual and constructive fraud. *Id.* § 24.005(a)(1)-(2). By contrast, Virginia has not enacted a version of the UFTA, instead retaining the common law of fraudulent transfers that dates to the reign of Queen Elizabeth I. Statute of 13 Elizabeth, ch. 5 (1571). Virginia's [*18] statute is modeled after the common-law doctrine of fraudulent transfers and simply declares that they are voidable. *See* Va. Code Ann. § 55-80; *Zazzali v. Swenson (In re DBSI, Inc.)*, 463 B.R. 709, 718-19 (D. Del. 2012). [7]

> 7  The UFTA has been adopted by 43 states, the Virgin Islands, and the District of Columbia. *Swenson*, 463 B.R. at 718-19. Two states, New York & Maryland, declined to adopt the UFTA and retain their versions of the UFCA. 5 Collier on Bankruptcy ¶ 548.01[2][a][ii] (16th ed.). Virginia is one of four U.S. jurisdictions that still follows fraudulent transfer common law developed from the Statute of Elizabeth. *Id.* ¶ 548.01[2][a][iii]. Louisiana has also not adopted the uniform acts, but its statutory avoidance provisions are based on the civil law analogues to the common law of fraudulent transfers. *See id.* n.46; La. Civ. Code Ann. art. 2036 cmt. (c) (1984)

("The revocatory or Paulian action, an institution derived from Roman law, is the civil law analogue to the common law suit to set aside a fraudulent conveyance." ).

While it is not clear how Virginia and Texas fraudulent transfer law may diverge in this case, it is likely that there will be slight variations between Virginia [*19] and Texas law that could affect the likelihood of recovery. *See, e.g., In re Best Prods. Co.*, 168 B.R. 35, 52 (Bankr. S.D.N.Y. 1994) (noting that Virginia law limits recovery for fraudulent transfers to cases of actual, rather than constructive, fraud, unlike the UFTA). Thus, while Virginia has an interest in application of the law that would benefit the defendants who are citizens of that state, the investors from Texas and other states would benefit from application of a uniform body of law like the UFTA. The factors regarding state and legal interests weigh in favor of Texas law, which is consistent with the UFTA.

This analysis also informs the court's evaluation of the factors on the needs of the interstate system, ease of application, and uniformity of result. The Fifth Circuit has directed courts "to further harmonious relations between states and to facilitate commercial intercourse between them." *Commerzbank*, 675 F.3d at 538 (quoting RESTATEMENT § 6 cmt. d (1971)). The *Commerzbank* court held that interstate needs were best met by application of New York law, "which reflects the approach taken by an overwhelming majority of the states." *Id.* Similarly, in this case, Texas law [*20] reflects the majority approach in the field of fraudulent transfer law, and these factors weigh in favor of TUFTA to facilitate commercial intercourse among the various states and promote ease of application and uniformity of result.

Lastly, the court considers the protection of justified expectations. While defendants may have expected Virginia law to apply to claims that arose between the parties based on the Virginia choice-of-law clauses in their agreements, as stated above, the focus of fraudulent transfer law is the protection of creditors, in this case the Noteholders whose interests are represented by the receiver. *See Commerzbank*, 675 F.3d at 537. Based on a review of the PPMs, the investing public would expect their investments to be managed in Texas, as that is the place of payment and of Evolution's corporate office in The Woodlands. The defendants have not cited any

Page 6

documents provided to the investing public that indicate that Virginia law governed the Noteholders' investments. This factor favors application of Texas law.

In sum, the Restatement factors from §§ 6 and 145, when considered in their totality, weigh in favor of applying Texas law to the receiver's fraudulent [*21] transfer claims. Accordingly, in evaluating the sufficiency of the receiver's pleading, *see infra*, the court will apply TUFTA, not Virginia's fraudulent conveyance statute.

**2. The Unjust Enrichment Claims**

Texas courts consider the following factors, in light of the principles of § 6 of the Restatement, to determine which state's law should apply to unjust enrichment claims: (1) the place where the parties' relationship was centered; (2) the place where defendant received the benefit or enrichment; (3) the location where the act conferring the enrichment or benefit was done; (4) the parties' domicile or place of business; and (5) the jurisdiction where a physical thing substantially related to the enrichment was situated at the time of the enrichment. Restatement § 221(2); *Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 193-94 (5th Cir. 2010).

These factors mirror those under § 145, with a focus on the enrichment at issue rather than the injury. In this case, the defendants received the alleged unjust enrichment in Virginia, while Evolution transferred the challenged assets from Texas. The receiver incorporates his arguments regarding application of Texas law to [*22] the fraudulent transfer claims, while defendants provide no support for their contention that Virginia law should apply to the unjust enrichment claims. "Texas choice of law rules require the party urging application of another state's substantive law to furnish the Court with sufficient information to establish that the law of another state applies." *Janvey v. Alguire*, 846 F. Supp. 2d 662, 671 (N.D. Tex. 2011) (Godbey, J.) (citing *Holden v. Capri Lighting, Inc.*, 960 S.W.2d 831, 833 (Tex. App.--Amarillo 1997, no pet.)) (internal quotation marks and alterations omitted). Here, defendants have not done so, and the court will thus apply the law of the forum, Texas, to the unjust enrichment claims.

**B. Defendants' 12(b)(6) Arguments**

As stated above, Texas law applies to the receiver's substantive claims of fraudulent transfers and unjust enrichment, while the law of incorporation for each entity defendant will apply to the court's veil-piercing considerations.

**1. The Fraudulent Transfer Claims**

The receiver alleges in his complaint that Evolution, which was operated as a Ponzi scheme, engaged in actual and constructive fraud against its investors when it transferred commissions and fees to each [*23] of the defendants, either directly or indirectly. *See* Dkt. 1 at 13-15 (pleading two counts of fraudulent transfers). Defendants move to dismiss these claims on two grounds: (a) failure to plead sufficient facts under Rule 9(b) against each defendant, and (b) the defendants acted in good faith at the time the transfers were made. Dkt. 17 at 7-10.

The defendants' pleading challenge requires the court to determine whether fraudulent transfer claims are subject to Rule 9(b)'s heightened pleading standard or the more relaxed Rule 8(a)(2) standard. As stated above, the general pleading rule, Rule 8(a)(2), requires only that a party provide a "short and plain statement" of the claim and include plausible facts showing a right to relief. *See* Fed. R. Civ. P. 8(a)(2); *Iqbal*, 556 U.S. at 677-78. But for claims with allegations of fraud against the defendant, Rule 9(b) requires litigants to plead these claims with particularity, which traditionally means that "[a]t a minimum . . . a plaintiff [must] set forth the who, what, when, where, and how of the alleged fraud." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (internal quotation marks omitted). [*24] This heightened pleading standard is well-settled and originates from a concern that litigants asserting a fraud claim must substantiate their allegations with more than a general statement of the fraudulent acts to protect against unwarranted damage to a defendant's reputation. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992). Indeed, the Fifth Circuit has explained that to state a cause of action for fraud, the plaintiff must "alleged with particularity the *defendant*'s acts which the plaintiff contends amount to fraud." *Unimobil 84, Inc. v. Spurney*, 797 F.2d 214, 217 (5th Cir. 1986) (emphasis added).

The receiver has pled two TUFTA counts against the defendants alleging actual and constructive fraud in Evolution's operation of a Ponzi scheme that defrauded the Noteholders. Dkt. 1 at 13-15. Notably, the receiver

has not alleged that any of the defendants in this action committed fraudulent acts, only that they received proceeds gained by fraud. The court thus sees no reason why Rule 9(b), which prescribes a strict standard to prevent unfounded accusations against the defendant, should apply to fraudulent transfer cases in which the transferee's conduct is not alleged to [*25] be fraudulent. See SEC v. Res. Dev. Int'l, LLC, 487 F.3d 295, 301 (5th Cir. 2007). And while the Fifth Circuit has not addressed whether TUFTA claims should be pled with particularity, this court holds, based on the reasoning above, that the receiver's TUFTA claims need not satisfy Rule 9(b)'s heightened standard to proceed beyond the initial pleading stage. See Janvey, 846 F. Supp. 2d at 675-76; GE Capital Commercial, Inc. v. Wright & Wright, Inc., No. 3:09-cv-572-L, 2009 U.S. Dist. LEXIS 121472, 2009 WL 5173954, at *10 (N.D. Tex. 2009) (Lindsay, J.).

The court now evaluates whether the receiver's fraudulent transfer allegations pass muster under Rule 8(a)(2). The receiver's first count alleges a TUTFA claim premised on the commission of actual fraud. Dkt. 1 at 13-14. Under TUFTA § 24.005(a)(1), a fraudulent transfer is established when the debtor makes a transfer "with actual intent to hinder, delay, or defraud any creditor." Tex. Bus. & Comm. Code Ann. § 24.005(a)(1). When the debtor operates as a Ponzi scheme, its fraudulent intent as to the transfers made is established as a matter of law. Res. Dev. Int'l, 487 F.3d at 301.

The receiver alleges that Evolution operated as a Ponzi scheme and transferred proceeds, [*26] as detailed in an attachment to the complaint, to defendants CBS and Waterford, who in turn transferred a portion of those proceeds to defendant Landi. Although the receiver's pleading is brief, he has apprised these defendants of sufficient facts demonstrating a plausible claim and enabling them to prepare a defense. And with regard to defendant AIC, the receiver has pled sufficient facts to support a veil-piercing theory against AIC, *see infra*, and AIC is also on notice of the particular fraudulent transfer claim alleged by the receiver. The defendants' motion to dismiss the first count of the receiver's complaint will therefore be denied.

The receiver next pleads a TUFTA claim premised on Evolution's constructive fraud against the Noteholders. Dkt. 1 at 14-15. The receiver claims that defendants' CBS and Waterford's brokerage services that were provided in exchange for the challenged transfers did not constitute

"reasonably equivalent value," thus subjecting them to avoidance. *Id.* at 14 ¶¶ 48-50. CBS and Waterford move to dismiss on grounds that this allegation lacks any supporting facts and that the defendants acted in good faith. Dkt. 17 at 8-9.

The court finds, however, that the [*27] receiver has pled sufficient facts regarding the TUFTA claims premised on constructive fraud to survive dismissal. In the case of constructive fraud, a Ponzi-scheme finding tends to show that a debtor who makes a transfer in furtherance of the scheme did not receive "reasonably equivalent value" from the transferee. Warfield v. Byron, 436 F.3d 551, 560 (5th Cir. 2006); In re Ramirez Rodriguez, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997). Further, the presence of a Ponzi scheme within the debtor's operations also supports the element of undercapitalization and knowledge of inability to pay debts upon making the transfer. Byron, 436 F.3d at 558 (stating the general rule that a Ponzi scheme is, "as a matter of law, insolvent from its inception") (citing Cunningham v. Brown, 265 U.S. 1, 7-8, 44 S. Ct. 424, 68 L. Ed. 873 (1924)). Thus, because the receiver has pled the existence of a Ponzi scheme pursuant to which transfers were made to the defendants, both directly and indirectly, he has met his pleading burden under Rule 8(a)(2) to provide a "short and plain statement" of his TUFTA claims under § 24.005(a)(2). [8] The defendants' motion to dismiss the receiver's second count will therefore be denied.

> 8  The [*28] defendants' argument that CBS and Waterford provided *bona fide* brokerage services in good faith is an improper attempt to go beyond the pleadings on a motion to dismiss. The court ordinarily does not consider an affirmative defense in determining whether the plaintiff's pleading meets the applicable standard, unless "a successful affirmative defense appears clearly on the face of the pleadings." *See* Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982); Beavers v. Metro. Life Ins. Co., No. G-07-260, 2007 U.S. Dist. LEXIS 83027, 2007 WL 3342540, at *7 (S.D. Tex. Nov. 8, 2007) (finding that a breach-of-contract claim, which carries a four-year limitations period, filed more than 13 years after the end of the pleading's challenged conduct was untimely). Here, the defendants' allegations tending to prove a good faith defense

Page 8

are not clearly established in the receiver's complaint, and they do not support granting the defendants' motion to dismiss the receiver's TUFTA claims. *See also GE Capital*, 2009 U.S. Dist. LEXIS 121472, 2009 WL 5173954, at *7 ("The court concludes that a showing of good faith and of reasonably equivalent value with respect to the [transfer] should be raised in a motion for summary [*29] judgment or at trial, rather than by a motion to dismiss.").

**2. The Unjust Enrichment Claims**

In count three of the complaint, the receiver asserts an unjust enrichment claim against all defendants, alleging that the defendants' commissions and fees derived from an unlawful Ponzi scheme and should not be retained at the expense of Evolution and its defrauded Noteholders. Dkt. 1 at 15 ¶¶ 53-58. The defendants move to dismiss this count on grounds that the receiver has not pled facts to support his claim that retention of the commissions and fees is "unjust." Dkt. 17 at 9.

Under Texas law, A person receives an unjust enrichment when he obtains "a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Unjust enrichment is an equitable theory that holds that the defendant who has received benefits unjustly, regardless of whether he committed a wrong himself, should make restitution of those benefits to the deprived person or persons. *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.--San Antonio 2004, pet. denied); *Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919, 927 (Tex. App.--Fort Worth 1994, writ denied). [*30] While defendants claim that the receiver has pled no facts to support a right to relief under the unjust enrichment theory, the court disagrees. The receiver has alleged that the defendants' receipt of the transferred commissions and fees derived from a fraudulent Ponzi scheme, and the defendants should not be permitted to retain an enrichment at the expense of defrauded investors. Dkt. 1 at 15 ¶ 55. The defendants' motion to dismiss the receiver's third count will be denied.

**3. The Veil-Piercing Allegations**

Lastly, the receiver alleges in his first three counts of the complaint that the corporate form of the entity defendants should be disregarded, *i.e.*, that the corporate veil should be pierced, and that they be held jointly and severally liable for transfers of proceeds to defendants CBS and Waterford. *See* Dkt. 1 at 14 ¶ 44, 15 ¶ 51, 15 ¶ 57. The defendants move to dismiss these allegations on grounds that the receiver has not pled sufficient facts to permit the court to disregard the corporate form of any defendant. Dkt. 17 at 10-13.

When deciding whether to pierce the corporate veil, a Texas court applies the law of the state in which the entity is organized. *Heritage*, 413 B.R. at 510. [*31] AIC and CBS are organized under Virginia law, [9] while Waterford is organized under Florida law. To disregard the form of Virginia entities, the plaintiff must plead factual allegations that "first establish that the corporate entity was the *alter ego*, alias, stooge, or dummy of the individuals sought to be charged personally[, which] may be established by evidence that the defendant exercised undue domination and control over the corporation . . . ." *Perpetual Real Estate Servs., Inc. v. Michaelson Props., Inc.*, 974 F.2d 545, 548 (4th Cir. 1992) (applying Virginia law) (internal quotation marks and citations omitted). The "plaintiff must also establish that the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime." *Id.* Virginia courts rarely disregard the corporate form, recognizing the preservation of corporate formalities as a "vital economic policy," and piercing the veil in "extraordinary" cases only. *Beale v. Kappa Alpha Order*, 192 Va. 382, 64 S.E.2d 789, 796 (Va. 1951); *see also Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 360 S.E.2d 828, 831, 4 Va. Law Rep. 805 (Va. 1987) (stating that the corporate form should be disregarded only when necessary to promote justice).

> [9] The receiver [*32] alleges in the complaint that CBS is organized under the laws of the state of Colorado. Dkt. 1 at 4 ¶ 12. However, because the parties seem to agree in the briefing that CBS is a Virginia company, Dkt. 17 at 5 n.2; Dkt. 19 at 20, the court will consider defendants' arguments on whether to dismiss the veil-piercing allegations under Virginia law.

Under Florida veil-piercing law, which applies to Waterford, "the plaintiff must prove that: (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the

Page 9

corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant." *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. Dist. Ct. App. 2008).

Here, the receiver pled that the entity defendants shared controlling officers and directors, operated business from the same geographic location during the relevant time period, failed to observe corporate formalities and distinctions, and had common business departments. Dkt. 1 at 12-13 ¶¶ 35-39. [*33] While the receiver's allegations are not fulsome, the court finds that the receiver has pled sufficient facts to survive a motion to dismiss veil-piercing allegations under Virginia and Florida law. [10] The defendants' motion to dismiss the receiver's veil-piercing allegations therefore will be denied.

> 10 The court recognizes that piercing the corporate veil is rarely done and requires substantial evidence to do so. But this hurdle is an evidentiary one, and the receiver should have an opportunity to develop facts in discovery, if he can, that will support piercing the corporate veil of the entity defendants in this case.

### III. Conclusion

Alleging that the defendants received brokerage commissions and fees from an entity that perpetrated a Ponzi scheme, the receiver of that entity sued the defendants for disgorgement of those financial gains. Dkt. 1. The receiver pled claims of fraudulent transfers and unjust enrichment under Texas law, and he sought to hold the entity defendants liable under a theory of piercing the corporate veil. *Id.* at 13-16. Having considered the receiver's allegations in the complaint, the court finds that the receiver has pled plausible claims that entitle him to [*34] relief under applicable state law and which are sufficient to survive a motion to dismiss under Rule 12(b)(6). The defendants' renewed motion to dismiss (Dkt. 17) is **DENIED**.

It is so **ORDERED**.

Signed at Houston, Texas on June 20, 2013.

/s/ Gray H. Miller

Gray H. Miller

United States District Judge